EDOK - Application for Search Warrant (Revised 5/13)

# United States District Court
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE NUMBER 580-513-8496, THAT IS STORED AT PREMISES CONTROLLED BY AT&T WIRELESS | **Filed Under Seal**<br><br>Case No.   21-MJ-438-SPS |

## APPLICATION FOR SEARCH WARRANT

I, Lucas Keck, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the **EASTERN** District of **OKLAHOMA** *(identify the person or describe property to be searched and give its location)*:

**SEE ATTACHMENT "A"**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT "B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Sections 81, 1151, 1153, 1001, and the application is based on these facts:

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Lucas Keck*
LUCAS KECK
SPECIAL AGENT, ATF

Sworn to before me and signed in my presence.

Date:   November 19, 2021

*[signature]*
Judge's signature
STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and state:   Muskogee, Oklahoma

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Lucas Keck, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.　I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 580-513-8496 ("the SUBJECT PHONE"), that is stored at premises controlled by AT&T Wireless, a wireless telephone service provider headquartered at 11760 US Highway 1 Suite 600, North Palm Beach, Florida 33408.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T Wireless to disclose to the government records and other information in its possession, pertaining to the subscriber or customer further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.　I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I am currently assigned to the ATF Tulsa Field Office with duties in the Northern District of Oklahoma and the Eastern District of Oklahoma.  I am an investigative officer, or law enforcement officer, of the United States of America within the meaning of Title 18, United States Code, Section 2510(7), that is an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18. I have been employed by ATF since 2015, and prior to my employment with ATF I was a Special Agent with the United States Secret Service (USSS) from 2009 through 2015.

3.      During my employment with the USSS, I conducted and participated in investigations of counterfeit currency, including purchasing counterfeit currency with confidential informants and undercover agents, identity theft investigations, credit card fraud, and bank fraud in both state and federal courts in the Southern District of Texas.  During my employment with ATF and with the USSS, I have assisted other agencies and law enforcement, including the Drug Enforcement Administration (DEA), with investigations regarding firearms and narcotics.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 81, Arson within Special Maritime and Territorial Jurisdiction of the United States, 18 U.S.C. §1153, Offenses Committed in Indian Country, and 18 U.S.C. § 1151, Indian Country Defined, 18 U.S.C. § 1001, and False statements to federal agents, have been committed by Joshua Devn PAGE.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

6.      On July 10, 2021, at approximately 10:15pm, the Henryetta 911 center received multiple calls regarding a dwelling on fire near 10th St and Trudgeon St. in Henryetta, Oklahoma, which is in the Eastern District of Oklahoma.  Fire and law enforcement responded and learned that a residence at 1008 W. Trudgeon St., Henryetta, Oklahoma was on fire.  The fire was

eventually put out, but the residence was badly damaged. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent (SA) Lucas Keck was contacted regarding the fire that same evening by Chief Steve Norman of the Henryetta Police Department (HPD). Chief Norman explained that the owner of the residence was Joshua Devn PAGE (PAGE), who is a member of the Choctaw Nation. Chief Norman had concerns regarding the fire's origin and cause. Chief Norman contacted ATF for assistance after determining PAGE's tribal membership status.

7. SA Keck advised that ATF could not respond that night and requested Chief Norman hold the scene until the following day. SA Keck requested the assistance of an ATF Certified Fire Investigator (CFI) and an ATF Accelerant Detection K-9 to respond and investigate the fire on July 11, 2021. HPD maintained an officer at the fire scene until the following morning.

8. On July 11, 2021, at approximately 8:00am, SA Keck responded and met with HPD at 1008 W. Trudgeon, Henryetta, Oklahoma. SA Keck was told that HPD and Muskogee Nation Lighthorse Police (MNLP) had been involved with the address the previous two days. SA Keck was told PAGE had contacted HPD and then MNLP regarding the residence and a person staying at the residence. SA Keck was told that PAGE owned the house and was having trouble with I.V. staying or squatting at the residence, and that PAGE wanted I.V. removed from the residence. SA Keck was also told that PAGE may have intimidated another person, J.B., who had a claim in ownership of the residence. SA Keck observed that the former residence at 1008 W. Trudgeon St., Henryetta, Oklahoma was badly burned, the floor was still intact and only a few walls remained. The residences to the east and west sustained fire damage due to the exposure from the fire at 1008 W. Trudgeon St.

9. While SA Keck was waiting for the ATF CFI and K-9 to arrive, PAGE arrived at the residence. SA Keck spoke with PAGE regarding the fire. PAGE told SA Keck that he purchased the property at 1008 W. Trudgeon St., Henryetta, Oklahoma from the lawful owner, J.C., but found out the owner's daughter, T.V., had previously sold the residence to another person, J.B.. PAGE said he was able to get all parties to sign paperwork showing that PAGE purchased the property, and PAGE said that he put the property in his wife's name. PAGE showed SA Keck documents to support his statements. PAGE also told SA Keck that he was attempting to demolish the residence to build a duplex on the property, but that the City of Henryetta had stopped him until he requested a permit from the city. PAGE expressed frustration that he had dealt with both HPD and MNLP over the previous days to help evict squatters, telling SA Keck that neither department appeared willing or able to assist. PAGE told SA Keck that I.V. and P.B. were the persons squatting in the residence. PAGE told SA Keck that he also had purchased the residence to the west of 1008 W. Trudgeon St.

10. PAGE told SA Keck that he was not in Henryetta at the time of the fire. PAGE said that he had gone to Okmulgee at approximately 8:30pm on July 10, 2021, and had not come back to Henryetta, Oklahoma until he was notified the residence was on fire. PAGE told SA Keck that he did not have insurance on the residence and was going to demolish it. PAGE told SA Keck that B.S., who lived at the corner, would tell SA Keck that he had observed I.V. near the residence just prior to the fire. PAGE told SA Keck that the electric, water, and gas had been disconnected from the residence for years.

11. After ATF CFI Chad Oubre and ATF Canine Hander Adrian Siebel, along with her accelerant detection canine (ADC) Annie, arrived and took control of the fire scene, SA Keck began interviewing neighbors regarding the fire.

12. SA Keck spoke with A.R., a neighbor to PAGE. A.R. told SA Keck that she owned her residence and was home with her daughter the previous evening when the fire started. A.R. said she smelled smoke and noticed a glow in the window, then a person was beating on her door to tell her there was a fire next door. A.R. went outside with her daughter and said that neighbors used garden hoses to keep her house wet until the fire department arrived. SA Keck observed the west side of AR's residence and noted fire damage to a tree, the siding on the residence, and broken windows. Curtains and pillows in the broken windows showed scorch marks from the heat of the fire as well.

13. SA Keck interviewed L.C., a neighbor across the street from 1008 W. Trudgeon St. L.C. told SA Keck that he also owned the residence to the west of 1008 W. Trudgeon St., and that he was talking with Josh PAGE to possibly sell PAGE the residence. L.C. said that he did not observe or hear anything prior to the fire but came outside after the fire started and watched the fire.

14. SA Keck interviewed B.S., who lives in Henryetta, Oklahoma, in close proximity to the fire. B.S. told SA Keck that Josh PAGE is his cousin and owned the residence at 1008 W. Trudgeon St. He said he had contacted HPD on PAGE's behalf after seeing persons taking items from the residence lately and was told to contact MNLP instead due to PAGE being an enrolled tribal member. B.S. said that he observed I.V. and P.B. taking items from the residence and placing them in a nearby garage on the day of the fire. B.S. said he did not see I.V. or anyone else near the residence near the time of the fire. B.S. said he was at a friend's house at around 9:00pm on July 10, 2021 and had returned home at about 10-10:30pm. B.S. said he did not see anyone near the residence, no lights, and no vehicles parked on the street when he returned

home. B.S. said he was in the front room of his residence and could see headlights through the curtains if a vehicle drove by.

15.  SA Keck interviewed another neighbor of PAGE, C.P.,. C.P. said he did not notice anything before the fire or during the fire, but that he had surveillance video from the front of his residence. C.P. provided SA Keck a copy of the surveillance video.

16.  SA Keck also obtained surveillance video from D.C., another neighbor to PAGE.

17.  SA Keck reviewed surveillance video from C.P.'s residence. SA Keck noted the fire started at approximately 22:13:47 based on the time stamp from C.P.'s surveillance system. SA Keck watched earlier video and noted that just prior to the fire, a vehicle left a driveway that SA Keck was able to identify as B.S.'s, at 1012 W. Trudgeon St. The vehicle moved east and stopped in front of 1008 W. Trudgeon St. and sat there for approximately 60 seconds. SA Keck observed a person come from the south side of Trudgeon St. and enter the passenger side of the vehicle, which then sped off. In the video, SA Keck could observe that the fire at 1008 W. Trudgeon had started, and a glow from the fire was distinctly visible when the vehicle left at a high rate of speed.

18.  SA Keck noted that prior to the vehicle leaving B.S.'s residence, an SUV turned near B.S.'s residence and travelled east on Trudgeon St. past C.P.'s residence. SA Keck noted the vehicle was a lighter colored SUV that appeared to be a Chevy Tahoe. The vehicle had distinct dark or black wheels on it and dark tint. SA Keck noted this vehicle appeared to be the same vehicle that SA Keck knows is owned by Josh PAGE. SA Keck observed PAGE on video in front of C.P.'s residence at approximately 22:29 based on the time stamp from C.P.'s surveillance video.

19. SA Keck watched surveillance video from D.C.'s residence. SA Keck noted that the times for D.C.'s surveillance system appeared to be off, but SA Keck was able to locate the time of the fire and work backwards. SA Keck noted on this video that a vehicle that appeared to be B.S.'s truck arrived at B.S.'s residence at around 10:00pm. Two other vehicles arrived and parked in B.S.'s driveway shortly after 10:00pm, and at least one person can be observed exiting a vehicle. The vehicles stayed in the driveway for several minutes, then one vehicle left the driveway and traveled east, stopping in front of 1008 W. Trudgeon St. This video corresponds with the surveillance video SA Keck observed from C.P.

20. SA Keck continued to backtrack with D.C.'s surveillance video and observed a Chevy Tahoe that appeared to be the same Chevy Tahoe owned by Josh PAGE stop near D.C.'s residence. The vehicle sat on the street, then departed. The same vehicle is later observed turning east on Trudgeon St. near B.S.'s residence and driving past both B.P.'s and D.C.'s residences prior to the fire starting.

21. SA Keck spoke with ATF CFI Oubre after ATF CFI Oubre had examined the residence. With the assistance of TFO Siebel's Accelerant Detection K-9, ATF CFI Oubre informed SA Keck that he found what he believed were irregular patters consistent with an ignitable liquid having been poured in multiple rooms of the residence. With the assistance of ATF Canine Annie, nine fire debris samples were collected and sent to the ATF Forensic Science Laboratory for ignitable liquid testing. The results of the examination are still pending.

22. On October 1, 2021, SA Keck attempted to interview B.S. again. SA Keck contacted B.S., and learned that B.S. was out of town working, but would be available the next week.

23. On October 1, 2021, SA Keck was contacted by Josh PAGE. PAGE sounded upset and irritated and said that B.S. had called PAGE and was angry that ATF was attempting to contact B.S. again. PAGE attempted to gather information regarding the investigation from SA Keck, and told SA Keck that PAGE was told I.V. had set the fire. PAGE told SA Keck several times that he may press charges, but it was unclear what charges, to whom the charges were against, or whom PAGE would file the charges with.

24. On October 4, 2021, SA Keck and SA Rebecca Davison interviewed B.S. in Tulsa, Oklahoma. SA Keck asked B.S. if he had contacted PAGE on Friday and whether he was upset that ATF was speaking with him again. B.S. appeared calm and willing to speak with SA Keck and told SA Keck that he was not upset that ATF was interviewing him again. B.S. said he was not upset when he talked with PAGE on Friday and had just called to tell PAGE that ATF was going to speak with him again.

25. SA Keck went over B.S.'s prior interview with him and asked if there was anything to add. B.S. said he had a bad memory, but the previous interview sounded accurate and there was nothing to add. SA Keck asked questions about vehicles or persons at B.S.'s residence prior to the fire and was told no one was there. SA Keck showed B.S. surveillance video that showed vehicles in his driveway prior to the fire, and that the vehicle stopped in the road when the fire started. B.S. was adamant that he did not have anyone at his residence and that he did not know there were cars outside of his residence before the fire. After watching the surveillance video again, B.S. told SA Keck that the vehicle in the video appeared to be a car that was owned by Josh PAGE. This was not the SUV that SA Keck had observed on surveillance video, but was the vehicle that left B.S.'s residence, stopped in front of 1008 W. Trudgeon St., and then departed at a high rate of speed as the fire was growing. B.S. then told SA Keck that

PAGE had said he hoped the residence at 1008 W. Trudgeon St burned on July 10, 2021, after all of the issues with police and the city inspector. B.S. told SA Keck that PAGE had told him he, PAGE, had burned the residence at some point after the fire. B.S. told SA Keck that PAGE told him this in a joking manner, and that he did not believe PAGE was serious when he made the comment that he had burned the residence.

26. Because of prior interactions with PAGE, SA Keck knows that Joshua Devn PAGE's cellular telephone number is 580-513-8496 (SUBJECT PHONE). (The cellular telephone provider is New Cingular Wireless, which has been taken over by AT&T Wireless.) I believe that PAGE had his phone in his possession on July 10, 2021 because PAGE claimed he was called and informed about the fire shortly after the fire started. Further, the use of cellular technology has increased to the point where most persons carry a cellular telephone on their person. According to the Pew Research Center, "smartphone ownership is growing rapidly around the world." According to research conducted by the Pew Research Center in February of 2019, within the United States, 94% of adults own a mobile phone. Of that 94%, nearly 97% of persons between the ages of 18 – 34 own a mobile phone, 98% of those persons between the ages of 35 – 49 own a mobile phone and 90% of persons over the age of 50 own a mobile phone. In *Carpenter v. United States*, 138 S.Ct. 2206, 2212 (2018), the United States Supreme Court reasoned that, "There are 396 million cell phone service accounts in the United States – for a Nation of 326 million people." In addition, the Court noted that a cell phone is almost "a feature of human anatomy," and that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." *Id.* at 2218. The Court recognized that, "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to

9

participation in modern society." *Id.* at 2210; *see also Riley v. California*, 573 U.S. 373, 385 (2014) (noting that cell phones are so common that "the proverbial visitor from Mars might conclude they were an important feature of human anatomy.) I believe that data provided from AT&T will show that PAGE was in Henryetta at the time of the fire instead of Okmulgee. Depending on the location in Okmulgee, there is approximately a 15-mile distance between the two cities that will show whether PAGE was in one location or another at the time of the fire and before the fire.

27. In my training and experience, I have learned that AT&T Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

28. Based on my training and experience, I know that AT&T Wireless can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as AT&T Wireless typically collect and retain cell-site data pertaining to cellular phones to which they

provide service in their normal course of business to use this information for various business-related purposes. Additionally, AT&T Wireless collects historical mobile location information with the use of their Network Event Location System (NELOS), which can provide location information for the specific device in question.

29. Based on my training and experience, I know that wireless providers such as AT&T Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## CONCLUSION

30. Based on the foregoing, I request that the Court issue the proposed search warrant.

31. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on AT&T. The government requests that the Court direct AT&T Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

  32. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Oklahoma: is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

            Respectfully submitted,

            *Lucas Keck*
            _____
            Lucas Keck
            Special Agent
            ATF

Subscribed and sworn to before me on November __19__, 2021

            _____
            UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

Records and information associated with the cellular telephone assigned call number 580-513-8496, ("the Account"), that are stored at premises controlled by AT&T Wireless ("the Provider"), headquartered at 11760 US Highway 1 Suite 600, North Palm Beach, Florida 33408.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **12:01pm July 10, 2021** through **12:00pm July 11, 2021.**

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

 b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

  iii. Historical Mobile Location Information commonly known as NELOS data and relevant GPS coordinates of the device during aforementioned time range.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of 18 U.S.C. § 81, Arson within Special Maritime and Territorial Jurisdiction, 18 U.S.C. §1153, Offenses Committed in Indian Country, and 18 U.S.C. § 1151, Indian Country Defined, 18 U.S.C. § 1001, False statements to federal agents, have been committed by Joshua Devn PAGE during the period **12:01pm July 10, 2021** through **12:00pm July 11, 2021.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.